**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

| | |
|---|---|
| DAVID AFZAL and ANDY DECHARTIVONG, on behalf of themselves and all others similarly situated, | Case No.: 2-15-08009 (MCA)(LDW) |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| BMW OF NORTH AMERICA, LLC, and BAVARIAN MOTOR WORKS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................1

JURISDICTION ...................................................................................5

VENUE ...............................................................................................5

PARTIES .............................................................................................6

   Plaintiff David Afzal .................................................................6

   Plaintiff Andy Dechartivong .....................................................9

   The Defendants .......................................................................11

TOLLING OF STATUTES OF LIMITATIONS ..................................13

FACTUAL ALLEGATIONS ...............................................................13

  A.  The Defective Rotating Assembly within the Class Vehicles ......................13

  B.  Defendant's Knowledge of the Rotating Assembly Defect ..........................23

Inherent Design Flaw in the Design of the S65's Rotating Assembly .................................24

BMW-NA and BMW-GER Investigate Specific Reports of the
Rotating Assembly Defect Very Early in S65 M3 Model Run .........................................25

Manifestation of Identical Rotating Assembly Defects in
S85-Equippped BMWs ......................................................................29

Other Sources of Defendants' Knowledge .........................................31

   Vendor 1................................................................................34

   Vendor 2................................................................................34

   Vendor 3................................................................................35

   Vendor 4................................................................................35

   Vendor 5................................................................................35

  C.  Complaints Filed With NHTSA...............................................36

  D.  BMW's Warranty-Related Practices.........................................38

i

CLASS ALLEGATIONS ................................................................39

     Numerosity................................................................39

     Existence and Predominance of Common Questions of Fact and Law ........40

     Typicality ................................................................40

     Adequacy ................................................................41

     Superiority................................................................41

FIRST CAUSE OF ACTION ................................................................42
Violations of California's Consumer Legal Remedies Act ("CLRA")
(Cal. Civ. Code § 1750, *et seq.*)

SECOND CAUSE OF ACTION ................................................................44
Violations of California's Unfair Competition Law ("UCL")—
"Fraudulent" Business Practice
(Cal. Bus. & Prof. Code § 17200)

THIRD CAUSE OF ACTION ................................................................46
California's Unfair Competition Law ("UCL")—"Unlawful" Business Practice
(Cal. Bus. & Prof. Code § 17200)

FOURTH CAUSE OF ACTION ................................................................47
California's Unfair Competition Law ("UCL")—"Unfair" Business Practice
(Cal. Bus. & Prof. Code § 17200)

FIFTH CAUSE OF ACTION ................................................................48
Violation of California's False Advertising Law ("FAL")
(Cal. Bus. & Prof. Code §§ 17500, *Et Seq.*)

SIXTH CAUSE OF ACTION ................................................................50
Breach of Express Warranty

SEVENTH CAUSE OF ACTION ................................................................52
Breach of Implied Warranty

EIGHTH CAUSE OF ACTION ................................................................53
Breach of Written Warranty Under the Magnuson–
Moss Warranty Act (15 U.S.C. § 2301, *Et Seq.*)

NINTH CAUSE OF ACTION ................................................................55
Violation of the Song-Beverly Act—Breach of Implied Warranty
(Cal. Civ. Code §§ 1792, 1791.1, *Et Seq.*)
(By Plaintiff Andy Dechartivong)

TENTH CAUSE OF ACTION ........................................................................56
Breach of the Duty of Good Faith and Fair Dealing

ELEVENTH CAUSE OF ACTION ................................................................57
Common-Law Fraud

PRAYER FOR RELIEF ................................................................................58

## PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs David Afzal and Andy Dechartivong bring this action against Defendant BMW of North America and Bavarian Motor Works (together, "BMW" or "Defendants") by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees with model years ("MY") 2008 to 2013 BMW M3 vehicles containing the S65 engines (the "Class Vehicles").[1]

2.      This action arises from Defendants' failure, despite their longstanding knowledge of a material defect, to disclose to Plaintiffs and similarly situated consumers that the S65 engines in the Class Vehicles contain, *inter alia*, defective rotating assemblies (including defective connecting rod bearings, defective main bearings, defective connecting rod side clearances, and/or insufficient channels of engine lubrication) (herein, the "Rotating Assembly Defect"). As explained below, when the connecting rod bearings and main bearings (herein, the "Bearings") begin to fail, metal debris from the defective Bearings is circulated throughout the engine via contaminated engine oil. This defect – which existed at the time each Class Vehicle was manufactured, and typically manifests itself during and shortly after the limited warranty period has expired – will inevitably cause the Class Vehicles to experience catastrophic engine failure. Further, due to insufficient channels of oil lubrication in the S65 engines, the Class

_____

[1] The BMW M3 is a high-performance trim model of the BMW 3 Series vehicles, also known as the "E90" vehicles. Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

Vehicles often experience accelerated and premature catastrophic engine failure that can result in stalling events while the vehicle is being operated.

3.       Significantly, the Rotating Assembly Defect poses a safety risk to the operator and passengers of the Class Vehicles. The failure of the Bearings can cause complete catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speeds, and the insufficient lubrication channels accelerate the time it takes the Class Vehicles to experience catastrophic engine failure. In particular, the vehicle's hydraulic power steering is driven directly by the rotating assembly of the engine and thus, a failure of the engine rotating assembly will cause a sudden and complete loss of power steering, significantly impairing the driver's control of the vehicle. Upon information and belief, the braking systems within the Class Vehicles will also suffer a loss of power assistance when the defect manifests. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accidents, injuries, or death. As discussed further herein, numerous owners and lessees of the Class Vehicles have experienced engine damage and catastrophic failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger.

4.       Not only did Defendants actively conceal the fact that particular components within the Class Vehicles' engines are defective and did not meet specifications, they did not reveal that the existence of the Rotating Assembly Defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5.       BMW has long been aware of the Rotating Assembly Defect. Yet, notwithstanding its longstanding knowledge of this defect, BMW has routinely refused to repair the Class Vehicles without charge when the Rotating Assembly Defect manifests. Indeed, in many cases BMW has even refused to disclose the existence of the Rotating Assembly Defect

when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until it has resulted in significant mechanical problems, necessitating costly repairs to owners and lessees.[2]

6.       Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or Defendants' agents to request that they remedy and/or address the Rotating Assembly Defect and/or resultant damage at no expense. Defendants have routinely failed to do so.

7.       BMW has also refused to take any action to correct this concealed Rotating Assembly Defect when it manifests in the Class Vehicles outside of the factory warranty period of four (4) years or 50,000 miles. Since the defect often manifests shortly outside of the factory warranty time period for the Class Vehicles,—and given Defendants' knowledge of this concealed, safety related defect—BMW's attempt to limit the warranty with respect to the Rotating Assembly Defect is unconscionable and unenforceable here.[3]

---

[2] BMW communicates indirectly with vehicle owners and lessees through its network of authorized dealerships. Upon information and belief, and in addition to sales brochures and other such advertising materials, BMW circulates its special service messages and technical service bulletins to these authorized dealerships. As a result, BMW knew that its customers depended at least in part on its authorized dealerships for information about their vehicles, and that BMW authorized dealerships would have disclosed the Rotating Assembly Defect to consumers had BMW required it.

[3] Many of the failures manifest just outside the factory warranty's four-year time limit but on very low mileage vehicles, well-below the factory warranty's 50,000-mile mileage limit.

8.      Despite notice and knowledge of the Rotating Assembly Defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including durability testing and replacement part sales, BMW has not recalled the Class Vehicles to correct such problem, offered its customers suitable repairs or replacements free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the defect.

9.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner, giving rise to substantial aggravating circumstances.

10.     Had Plaintiffs and other Class Members known of the Rotating Assembly Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

11.     Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12.     As a result of the defect and the monetary costs associated with attempting to repair the Rotating Assembly Defect, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

13.     Accordingly, Plaintiffs bring this action to redress Defendants' violations of California law, including California's consumer fraud statutes, and also seeks recovery for

Defendants' breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and common law fraud.

## JURISDICTION

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this Judicial District, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the District of New Jersey and throughout the United States.

## VENUE

16.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391 because Defendant BMW of North America, LLC ("BMW-NA") maintains its principal place of business in this District. Moreover, Defendants transact business in this District, are subject to personal jurisdiction in this District, and therefore are deemed to be citizens of this District. Additionally, there are one or more authorized BMW dealers within this District and Defendants have advertised in this District and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this District; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

## PARTIES

### Plaintiff David Afzal

17.     Plaintiff David Afzal ("Plaintiff Afzal") is a citizen of the State of California, and currently resides in Pacific Palisades, California.

18.     In or around May 2013, Plaintiff Afzal purchased a 2011 BMW M3 in Northern California with approximately 13,100 miles on the odometer (VIN: WBSPM9C5XBE698954). The vehicle was delivered to the original purchaser on November 12, 2011, and was financed directly through BMW Financial Services, a subsidiary of Defendant BMW-NA.

19.     Plaintiff Afzal arranged and paid for a pre-purchase inspection conducted by Weatherford BMW in Berkeley, California. The vehicle was found to be in good working condition with no noticeable defects or abnormal noises from the engine or drivetrain. On that basis, Plaintiff Afzal purchased the vehicle by paying $54,814.83 directly to BMW Financial Services, which, at the time, reflected the current pay-off amount of the vehicle. At the time of purchase, the vehicle was still within the four-year/50,000-mile transferable factory warranty.

20.     On or about March 30, 2015, at 28,253 miles, while still within the factory warranty, Plaintiff Afzal brought his vehicle to Steve Thomas BMW (herein "Steve Thomas BMW"), an authorized BMW dealership located in Camarillo, California, due to loud "knocking" or "rattling" noises at idle that appeared to be coming from inside or below the engine. Thereafter, Plaintiff Afzal, having seen reports about rod bearing wear and resulting engine failure in other Class Vehicles, was concerned that the noise might be due to rod-bearing wear in his vehicle and expressed that same concern to his Service Advisor. Plaintiff Afzal further played the Service Advisor at Steve Thomas BMW a clip of the engine area noise that he recorded with his smartphone during the vehicle's cold-start cycle when the noise was most pronounced. Plaintiff Afzal was told by Steve Thomas BMW that the noises had been

investigated and were due to "normal exhaust heat expansion noises." As a result, no warranty inspections or repairs were offered to Plaintiff. The vehicle was returned to Plaintiff Afzal later that same day with the same noises still occurring at idle.

21.     On or about April 6, 2015, at 28,456 miles, Plaintiff Afzal, now increasingly concerned, brought his vehicle back to Steve Thomas BMW due to the same loud "knocking" or "rattling" noises emanating from the engine bay at idle. Again, Plaintiff Afzal expressed concern that the noises were symptomatic of rod-bearing wear. The vehicle remained at Steve Thomas BMW for several days to undergo an evaluation. On April 9, 2015, Plaintiff Afzal was again advised that the "noise" was attributed to "normal exhaust expansion noises," and that Steve Thomas BMW and BMW-NA therefore declined to perform an inspection or replacement of Plaintiff's engine bearings under warranty. Plaintiff Afzal retook possession of his vehicle on April 10, 2015.

22.     Frustrated at BMW-NA's unwillingness to investigate the issue further and concerned that the engine noises might be due to rod bearing wear, thus a symptom of impending engine failure, Plaintiff Afzal brought his vehicle to an independent BMW repair specialist on May 1, 2015, at 28,952 miles, for an inspection and diagnosis. Upon listening to the engine noises, the technician suspected the noise was *not* due to "normal exhaust expansion noises," but was instead a symptom of excessive wear to the connecting rod bearings. In light of the potential for catastrophic engine failure, the technician recommended that the issue be investigated further, consisting of a visual inspection of the connecting rod bearings. The technician advised Plaintiff Afzal that to access the connecting rod bearings, the technician would have to remove the front wheels, disconnect the brake lines and various suspension components, lower the front sub-frame, drain the oil pan of its existing engine oil, remove the oil pan, then loosen the rod bolts and remove the connecting rod end cap on each connecting rod, at which time the technician

would be able to inspect the connecting rod bearings and the crankshaft journals. Plaintiff Afzal agreed to have the inspection completed.

23.     The inspection of Plaintiff Afzal's connecting rod bearings confirmed that they were excessively worn and the vehicle was in danger of imminent and catastrophic engine failure at just 28,952 miles. The technician recommended immediate replacement of the rod bearings and Plaintiff Afzal agreed to the repair. Set forth below is a picture illustrating the excessive wear of his vehicle's connecting rod bearings at the time of replacement:



24.     Plaintiff Afzal's engine received new connecting rod bearings, connecting rod bolts, and the oil pan was filled with fresh engine oil and a new oil filter was installed. Plaintiff paid $539.95 for the new bearings, $349.95 for the new rod bolts, $185.00 for new engine oil and oil filter, and $1,075 in labor, for a total of $2,217.18. After this repair, the "knocking" and "rattling" noises, previously brought to the attention of Steve Thomas BMW, immediately disappeared, and as of the filing of this complaint, have not returned.

25.     At all times relevant to this complaint, the vehicle had regularly scheduled engine oil changes that met or exceeded the recommended oil-change intervals specified by BMW.

**Plaintiff Andy Dechartivong**

26.     Plaintiff Andy Dechartivong ("Plaintiff Dechartivong") is a citizen of the State of California, and currently resides in Downey, California.

27.     On or about December 2014, Plaintiff Dechartivong purchased a pre-owned 2011 E92 M3 from South Bay BMW, an authorized BMW dealership located in Torrance, California. At the time of purchase, the vehicle had just 24,200 miles on the odometer.

28.     In early September 2016, at approximately 28,800 miles, Plaintiff Dechartivong experienced sudden catastrophic engine failure. In particular, the engine shut off abruptly while Plaintiff Dechartivong was driving, causing a sudden loss of power, electrical function, and power steering. Subsequent attempts to restart the vehicle failed.

29.     Plaintiff Dechartivong had the vehicle towed to an independent BMW service center on or about September 12, 2016. An inspection of the vehicle revealed severe rod-bearing wear, with extensive damage to several of the rod bearings and corresponding journals on the crankshaft, ultimately resulting in engine failure. Below are photos of the damage to the S65 engine in Plaintiff Dechartivong's vehicle as captured during the inspection on or about September 12, 2016:





30.     The independent service center confirmed that Plaintiff Dechartivong would need

a replacement engine and quoted him a total of $25,375.90 for installation of a used engine.

31.     To obtain a second opinion, Plaintiff Dechartivong then had the vehicle towed to

McKenna BMW, an authorized BMW dealership in Norwalk, California, and paid for an

inspection by BMW authorized technicians. The BMW technicians confirmed the findings of the

independent BMW service center and confirmed the engine could not be repaired. McKenna

BMW quoted Plaintiff Dechartivong $31,800 for installation of a replacement engine.

32.     Plaintiff Dechartivong repeatedly requested goodwill and/or warranty coverage

for a new engine from both Defendant BMW-NA and McKenna BMW both orally and in

writing. His requests were denied. <u>At present, Plaintiff Dechartivong's vehicle is still without a</u>

<u>working engine and is being stored at his home. He has not had use of the vehicle since the</u>

<u>engine failed in early September 2016.</u>

**The Defendants**

33.     Defendants are automobile design, manufacturing, distribution, and/or service

corporations doing business within the United States. Furthermore, Defendants design, develop,

manufacture, distribute, market, sell, lease, warrant, service, and repair passenger vehicles,

including the Class Vehicles.

34.     Defendant Bavarian Motor Works ("BMW-GER"), is a corporation organized and

existing under the laws of Germany, with its principal place of business located in Munich,

Bavaria, Germany. BMW-GER is the parent corporation of BMW of North America, LLC.

35.     Defendant BMW-NA is a corporation organized and existing under the laws of

the State of Delaware, with its principal place of business located at 300 Chestnut Ridge Road in

Woodcliff Lake, New Jersey. BMW-NA is BMW-GER's U.S. sales and marketing division,

which oversees sales and other operations across the United States. BMW-NA distributes BMW

vehicles and sells these vehicles through its network of dealers. Money received from the

purchase of a BMW vehicle from a dealership flows from the dealer to BMW-NA.

36.     BMW-NA and BMW-GER sell BMW vehicles through a network of dealerships

that are the agents of BMW-NA and BMW-GER.

37.     There exists, and at all times herein existed, a unity of ownership between BMW-NA, BMW-GER and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

38.     Upon information and belief, Defendant BMW-GER communicates with Defendant BMW-NA concerning virtually all aspects of the BMW products it distributes within the United States.

39.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Class Vehicle engines, as it relates to the Rotating Assembly Defect, were performed exclusively by Defendants BMW-NA and BMW-GER.

40.     Upon information and belief, Defendants BMW-NA and BMW-GER developed the post-purchase owner's manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

41.     BMW-NA and BMW-GER are collectively referred to in this complaint as "BMW" or "Defendants" unless identified separately.

42.     BMW engages in continuous and substantial business in New Jersey and California.

43.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## TOLLING OF STATUTES OF LIMITATIONS

44.     Any applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the engine defect until shortly before this class action litigation was commenced.

45.     In addition, even after Plaintiffs and Class Members contacted Defendants and/or their authorized dealers for vehicle repairs concerning the Rotating Assembly Defect, they were routinely told by Defendants and/or through its dealers that the Class Vehicles were not defective. As described below, the true cause of the premature and catastrophic engine failure is the defective rotating assembly.

46.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and the members of the Class the true character, quality and nature of the Class Vehicles, i.e. that the connecting rod bearings, the main bearings, and lubrication systems are defective and will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**A.**     **The Defective Rotating Assembly within the Class Vehicles**

47.     BMW is a multinational corporation with over 105,876 employees worldwide. BMW is currently the eleventh largest automobile manufacturer in the world by revenue.

48.     The S65 V8 engine (the "S65 Engine"), which BMW used in the Class Vehicles, is a four-liter V8 double overhead camshaft ("DOHC") piston engine that was manufactured by Defendants. The S65 Engine utilizes a conventional wet-sump lubrication system with two oil pumps.

49.     As background, the S65 Engine contained in the Class Vehicles uses two sets of four reciprocating pistons to convert pressure into a rotational force. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture being pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted through the piston to the crankshaft. And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself.  A diagram of the Combustion Cycle is below:



50.     The pistons are connected to the crankshaft via the connecting rods. As the connecting rods move up and down during the Combustion Cycle, this causes the crankshaft to rotate, resulting in power that is ultimately transmitted to the drive wheels of the vehicle. During

this cycle, the crankshaft rotates many thousands of times per minute within each of the eight (8) connecting rods. In order to reduce friction and promote longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces. As a result, the connecting rod bearings (or "rod bearings"), allow the crankshaft to rotate within the connecting rods during the Combustion Cycle. An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:





**Figure 3-70.—Connecting rod bearings.**

51.     The main bearings, also referred to as main crankshaft bearings, support the crankshaft and help it rotate. The main bearings hold the crankshaft in place and prevent the forces, created by the piston and transmitted to the crankshaft through the connecting rods, from dislodging the crankshaft, instead forcing the crank to convert the reciprocating movement into rotational power. The main bearings are mounted in the crankcase; however, the S65 Engine does not utilize a bearing cap. An exemplar diagram of the main bearings is included below:



52. When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, connecting rod bearings, main bearings, and other rotating and moving components as the pistons move up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing, and to cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the oil filter. Oil is pumped and pressurized throughout the engine by two oil pumps in the S65 Engine. The oil pumps draw oil from the oil pan, located underneath the crankshaft assembly. The oil pumps pressurize the oiling system, forcing engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction of the internal engine components. The engine oil then returns to the oil pan through small drainage holes located throughout the engine where it will be re-circulated by the oil pump.

Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



The Bearings are also lubricated with engine oil in order to allow the pistons to rotate along the crankshaft via the connecting rods and connecting rod bearings. The main bearings allow the crankshaft to convert the reciprocating movement of the pistons into rotational power or force. The below picture illustrates a new, unused connecting rod bearing designed for the S65 Engine:

53.



54.     In a properly designed and manufactured engine, oil thoroughly coats the bearing surfaces so that the bearings rarely, if ever, actually touch the crankshaft or connecting rods, and are instead separated from metal-to-metal contact by a thin barrier of oil.

55.     The defect inherent in the S65 Engine's rotating assembly causes an insufficient supply of engine oil to coat the bearing surfaces, compromising the integrity of the oil barrier between the bearings and the corresponding metal parts they are designed to protect. When the Rotating Assembly Defect manifests, it results in excessive and frequent contact between the connecting rods and connecting rod bearings, as well as, between the crankshaft and main bearings. This contact causes accelerated wear on the Bearings surfaces in the Class Vehicles, ultimately causing them to disintegrate and fracture.

56.     As the Bearings fracture, large amounts of metal debris begin to accumulate in the engine oil. As a result, the oil becomes so contaminated that the oil filter can no longer remove the plethora of metal debris from the oiling system. This contaminated engine oil is re-circulated

throughout the engine by the oil pumps, causing damage to the various engine components and eventually leading to catastrophic engine failure.

57.     Additionally, as the connecting rod bearings and main bearings continue to fracture, the acceptable tolerances between the Bearings, the connecting rods, and the crankshaft begin to rapidly deteriorate. Eventually, the Class Vehicles begin producing a "knocking" or "rattling" sound originating from the engine as a result of the deteriorating Bearings. The defective Bearings may eventually cause the piston to break through the engine block due to such deterioration – this space is referred to in the automobile industry as "play."

58.     Below are exemplar photographs of failed connecting rod bearings removed from a Class Vehicle displaying typical "knocking" and "rattling." As shown in the below photographs, the surfaces of the bearings have worn away due to severe metal-on-metal contact with the crankshaft revealing the copper inner core of the rod bearings. In some cases, fractures are also plainly visible where entire pieces of the bearings have broken away due to severe wear:





59.     The main bearings in the Class Vehicles suffer from the same defect as the connecting rod bearings, i.e. excessive wear and eventual failure. Pictured below are main bearings that failed in a class vehicle:



60.     As metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components. The metal debris and the loss of bearing integrity cause

damage to other critical components of the rotating assembly, including the crankshaft. Pictured below is the resulting damage to the crankshaft journal surface of a Class Vehicle due to premature connecting rod and main bearing wear:



61.     In the Class Vehicles, the lubrication channels are defective and clog under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be both pumped throughout the engine (through the oil pumps) or adequately return to the oil pan, causing a condition known as oil starvation in the engine. This results in insufficient lubrication throughout the Class Vehicles' engine, resulting in premature wear of the engine components and catastrophic engine failure that can result in stalling events while the vehicle is being operated.

62.     The Rotating Assembly Defect poses serious safety and security issues for operators and occupants of the Class Vehicles. By way of example, the California Department of Motor Vehicles asserts that stalled engines pose a significant safety risk and, as part of its safety

curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.[4]

63.     NHTSA takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure . . . Engine seizure could increase the risk of a crash."[5]

64.     Defendants failed to adequately research, design, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**B.**     **Defendant's Knowledge of the Rotating Assembly Defect**

65.     Defendant's knowledge of the Rotating Assembly Defect stems from several sources, including (1) an inherent and obvious design flaw in the S65 Engine's rotating assembly; (2) numerous early reports directly to BMW NA from owners whose cars manifested the Rotating Assembly Defect; and (3) the manifestation of the Rotating Assembly Defect in the S85, the predecessor to the S65 with an identical rotating assembly. Any one of these sources of information was sufficient to charge Defendants with knowledge of the Rotating Assembly Defect in the Class Vehicles prior to the sales that form the basis of this complaint.

---

[4] See https://www.dmv.ca.gov/portal/wcm/connect/ada60d78-9cfa-4250-bd2b-f616ef9dbe43/unit_8.pdf?MOD=AJPERES, at 08.F.07 (last visited Apr. 9, 2015).

[5] http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited Mar. 29, 2015); see also http://www.foxnews.com/leisure/2015/09/28/hyundai-recalls-470000-sonatas-to-replace-engines/ (last visited February 25, 2016).

**Inherent Flaw in the Manufacture of the S65's Rotating Assembly**

66.     Perhaps the most obvious source of Defendants' knowledge of the defect in the rotating assembly of every Class Vehicle is the insufficient rod and main bearing clearance that is inherent in the S65 Engine. Notably, at least until 2011, Defendant BMW sourced the rod bearings used in the S65 Engines from Mahle-Clevite, a well-known manufacturer of bearings in the automotive industry. Mahle-Clevite was the original equipment ("OEM") supplier of bearings in many prior BMW engines, and to others in the automotive industry.

67.     As an OEM supplier of bearings across the automotive industry, Mahle-Clevite publishes specifications for rod and main bearing clearances that are generally regarded as the industry standard. Per those industry standards, an engine should have a minimum of 0.00075" to 0.0010" of clearance per inch of crankshaft diameter. Mahle-Clevite also recommends an *additional* 0.0005" of clearance on high-horsepower and/or high-RPM engines, such as the Class Vehicles with the S65 Engine.

68.     Given the 52mm (2.047") crankshaft diameter on the S65 Engine at the rod journals, industry standards would require 0.00203" to 0.00254" of rod bearing clearance to ensure proper lubrication.

69.     Measurements from dozens of disassembled, unmodified S65 Engines show that BMW built the S65 Engines with just *half* of Mahle-Clevite's recommended minimum rod bearing clearances. Those measurements reveal that the S65 Engines were manufactured with just **0.00125"** of rod bearing clearance on average. The result is that every Class Vehicle sold by Defendants was manufactured with inadequate rod bearing clearances significantly below the *minimum* industry standard.

70.     The same is true for the main bearings in the S65 Engines. According to the generally accepted industry standards published by Mahle-Clevite, the S65 Engine's 60mm

(2.3622") crankshaft diameter at the main journals should have resulted in main bearing clearances of a minimum of 0.0227" to 0.00286." Again, as with the rod-bearing clearances, BMW departed from those generally accepted standards and manufactured the S65 Engine with an average of just **0.00125"** of main bearing clearance.

71.     Mahle-Clevite's published materials warn of the consequences of insufficient rod and main bearing clearance. Specifically, it can result in insufficient lubrication of the bearing and crankshaft surfaces because the excessively tight clearances restrict oil flow, resulting in an insufficient oil film "cushion" between the bearings and the corresponding crankshaft journals. Mahle-Clevite further warns that the resulting metal-on-metal contact between the bearings and crankshaft will lead to degradation of both the bearings and crankshaft, with eventual catastrophic engine failure. This, of course, is precisely what has happened in the Class Vehicles, though because of the latent nature of the defect, many Class members may be presently unaware that their bearings are deteriorating prematurely and need to be replaced to prevent a catastrophic engine failure.

72.     In short, when Defendant BMW choose to manufacture the S65 Engine with just 0.00125" of rod and main bearing clearance instead of the 0.00203" to 0.00254" of rod bearing clearance and 0.0227" to 0.00286" of main bearing clearance called for by Mahle-Clevite's generally accepted design standards in the industry, Defendants knew or should have known that excessive and premature bearing failure was a foreseeable consequence of its chosen design, with a resulting vastly increased likelihood of premature engine failure.

**BMW-NA and BMW-GER Investigate Specific Reports of the Rotating AssemblyDefect Very Early in S65 M3 Model Run**

73.     Aside from the actual or constructive notice that flowed from BMW's decision to manufacture the S65 Engine with less than half of the rod and main bearing clearance called for

25

under generally accepted standards, Defendants had actual notice of the bearing defect no later than June 2008, and it is believed that at least one motor with a manifestation of the defect was *sent back to the BMW factory in Germany in June 2008 for disassembly and analysis*.[6]

74.     As specifically detailed in message board threads, an owner of an almost new E92 M3 presented his vehicle to a BMW dealership multiple times in or about May 2008 with "rattling" and "ticking" noises from his engine.[7] The owner was first told that the noises were not normal, and the dealer requested it be allowed to keep the vehicle for further investigation. After the dealer probed further, the owner was later told that the noises had been investigated and were caused by normal exhaust heat expansion and contraction.[8]

75.     The rattling and ticking noises got worse, so the owner returned to his dealer in early June 2008. A senior engineer from Defendant BMW-NA happened to be visiting the dealership that day. The BMW-NA engineer conducted a test drive of the vehicle, at which time he noted that the noise was of serious concern and seemed to be emanating from within the engine itself. According to the owner, the BMW-NA engineer told the dealer not to touch the engine, and instead requested the owner's permission to allow the motor to be shipped to BMW-GER, so that it could be disassembled and inspected.[9] In a later post on the thread, the owner wrote that he received a follow-up call from the dealer who was still waiting for the owner's

---

[6] Plaintiffs' belief in that regard is derived from posts on "M3forum.net" and "M3Post.com;" popular message boards pertaining to S65-equipped BMW M3s which Defendants are known to regularly monitor and review.

[7] See http://www.m3forum.net/m3forum/showthread.php?t=213104.

[8] See http://www.m3forum.net/m3forum/showthread.php?t=213104&page=2 (Posts 14 and 15).

[9] See http://www.m3post.com/forums/showthread.php?t=147661&highlight=snowm3.

approval, and noting that "***BMW was anxious to get his engine back ASAP***."[10] (Emphasis added.)

76.     It is understood and believed that, at that time, based on their own inspection of a Class Vehicle, Defendants were confronted with clear evidence of the defect. Rather than replace or repair that particular engine, the customer was instead supplied with a new E92 M3 vehicle.[11]

77.     Two other reports of E9x M3's exhibiting identical symptoms were posted on M3Post.com in June[12] and July 2008,[13] with one of the posters noting his BMW service technician believed the problem was "bearings."[14] That poster followed-up in October 2008, reporting that BMW replaced his vehicle.[15]

78.     This same message board reveals that, in September 2008, another E9x M3 owner presented to a BMW dealership with the same "rattling" and "ticking" noises from his engine experienced by the other posters.[16]

---

[10] See http://www.m3post.com/forums/showthread.php?t=147661&highlight=snowm3&page=2 (Post 37).

[11] See http://www.m3post.com/forums/showthread.php?t=147661&highlight=snowm3&page=3 (Post 45).

[12] See http://www.m3post.com/forums/showthread.php?t=149811 (attaching audio clip of noise).

[13] See http://www.m3post.com/forums/showthread.php?t=147661&page=3 (Post 54).

[14] See http://www.m3post.com/forums/showthread.php?t=167402&highlight=knifegun (Post 3).

[15] See http://www.m3post.com/forums/showthread.php?t=167402&highlight=knifegun&page=3 (Post 45).

[16] See http://www.m3post.com/forums/showthread.php?t=147661&page=5 (Post 94).

79.     In October 2008, another owner reported on the same message board that he brought his car to East Bay BMW and the service technician noticed a ticking noise he believed to be caused by "rod bearings."[17]

80.     In December 2008, yet another owner reported that he brought his E9x M3 to a BMW dealership with the same "rattling" and "ticking" noises. He was asked to leave his vehicle at the dealership during which the dealer planned to contact BMW-NA.[18]  After originally being told that the sound was "not normal in any way," dealership personnel called the owner back to advise that the noises were instead caused by normal exhaust expansion and contraction, the same incorrect explanation that Plaintiff Afzal was given by technicians at Steve Thomas BMW.[19]

81.     The same message board as well as numerous other online resources reveal that, between December 2008 and the end of 2012, dozens of E9x M3 owners in North American reported "rattling" and "ticking" noises— symptoms of rod bearing failure—to BMW dealerships, with numerous others suffering outright engine failures.[20] It is believed and understood that, consistent with BMW-NA's established procedures, any episodes reported to BMW authorized dealerships were reported to Defendant BMW-NA.

---

[17] See http://www.m3post.com/forums/showthread.php?t=167402&highlight=knifegun&page=3 (Post 47).

[18] See http://www.m3post.com/forums/showthread.php?t=147661&page=5 (Post 103.)

[19] See http://www.m3post.com/forums/showthread.php?t=147661&page=6 (Post 114).

[20] See, e.g., http://www.m3post.com/forums/showthread.php?t=307802; http://www.bimmerfest.com/forums/showthread.php?t=439844; http://www.m3post.com/forums/showthread.php?t=786615.

**Manifestation of Identical Rotating Assembly Defects in S85-Equippped BMWs**

82.     Another source of Defendants' knowledge of the defects inherent in the S65

Engine stems from BMW's appreciation of the same exact defect in its predecessor engine, the

10-cylinder S85 engine in the E6x M5 and M6 vehicles.

83.     The S85 engine was first introduced in 2005, three years before the first S65-

equipped Class Vehicle was sold. From a design perspective, the S85 engine (a/k/a S85B50) is

essentially a 10-cylinder version of the 8-cylinder S65 engine (a/k/a SB65B40), a fact that is

underscored by Defendant's own marketing materials which tout the fact that "[t]he S65B40 is

derived from its big brother, the S85B50."

84.     Of particular note to this case is that, with the sole exception of the longer

crankshaft in the S85, the rotating assemblies of both engines are *identical.* Indeed, the S65 and

S85 engines share common part numbers for every other component in their rotating assemblies,

including rod bearings, main bearings, guide bearings, connecting rods, rod bolts, wrist pins,

snap rings, pistons, and piston rings. It is further understood and believed that the only difference

in the crankshafts is their length and the addition of journals for the extra two cylinders, but that

in all other relevant respects—including the size of the crank journals—the crankshafts in the

S65 and S85 engines are identical. Thus, the manifestation of a defect in the design of the S85

engine's rotating assembly should have put Defendants on notice of the high likelihood of a

similar problem in the S65 engine's rotating assembly.

85.     Plaintiffs are aware that, no later than July 2007, Defendant BMW-NA was

informed of at least one catastrophic engine failure in an S85-equipped BMW E60 M5 due to rod

bearing failure.[21] This particular engine failure was the subject of extensive public discussion on a popular online forum pertaining to the BMW M5, a forum which BMW-NA employees were known to periodically review and monitor.[22] This particular engine was presented to a BMW dealership in July 2007, at which point it was fully disassembled and inspected, with the findings (i.e., catastrophic engine failure due to premature rod-bearing degradation) reported to Defendant BMW-NA.[23]

86.    Plaintiffs further believe and are confident that discovery in this case will reveal that, between July 2007 and March 2012, numerous other S85 experienced manifestations of premature rod-bearing wear, including engine failures, and that many if not most of these vehicles were presented to BMW dealerships for inspection with the findings conveyed to Defendant BMW NA. *See*, *e.g.*, http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/119816-i-need-new-engine.html; http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/202643-500-s85-engine.html; http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/202643-500-s85-engine.html; http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/306849-s85-engine-replacement-registry-3.html.

87.    Below are images of rod bearings removed from S85 engines showing identical wear patterns as those in the Class Vehicles:

---

[21] See http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/99641-uh-oh-blown-engine-2.html#post1083181.

[22] See http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/103505-blown-engine-replacement.html.

[23] http://www.m5board.com/vbulletin/e60-m5-e61-m5-touring-discussion/103733-pics-blown-engine.html.





**Other Sources of Defendants' Knowledge**

88.     The experiences recounted above are by no means isolated or outlying

occurrences. Indeed, the Internet is replete with examples of blogs and other websites where

consumers have complained of the exact same Rotating Assembly Defect within the Class

31

Vehicles. Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, were well aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the Class Vehicles' S65 Engine or provide any adequate remedy.

89. BMW routinely monitors the internet for complaints similar in substance to those quoted above. BMW's customer relations department routinely monitors the internet for customer complaints, and BMW has retained the services of third-parties to do the same. Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, Defendants were made aware of the Rotating Assembly Defect. The complaints also indicate BMW's knowledge of the Rotating Assembly Defect and its potential danger.

90. Moreover, Defendants also should have known of the defective nature of the rotating assembly due to the sheer number of reports of engine problems and replacement part sales relating to the connecting rod bearings, main bearings, and/or lubrication channels. For instance, Defendants' customer relations department, which interacts with BMW-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings, main bearings, and insufficient and contaminated lubrication channels in the S65 Engines. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

91.     Defendants' warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

92.     Defendants knew or should have known about the Rotating Assembly Defect because of the high number of replacement parts likely ordered from BMW. All BMW service centers are required to order replacement parts, including engines, piston assemblies, connecting rod bearings and main bearings directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants. Defendants routinely monitor part sales reports, and are responsible for actually shipping parts requested by dealerships and technicians. Thus, Defendants have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The sudden increase in orders for S65 Engines and engine components used in the Class Vehicles was known to Defendants, and should have alerted them to the scope and severity of the Rotating Assembly Defect.

93.     The Defective Rotating Assembly affecting the Class Vehicles is widely acknowledged in the industry, as vendor websites selling aftermarket replacement bearing kits prominently note. The following quotes are from five of those websites:[24]

**Vendor 1:**

"The mighty and powerful BMW S65 has an "Achilles Heel", it's rod bearings. As great and powerful as BMW made the S65 engine, they left it lacking in a critical area—it's rod bearing reliability.

- ***Q: Do I need VAC Bearings?***
A: Unfortunately, you might... BMW will not disclose their logic as to why the build engines the way they do. Its up to engine builders such as ourselves to come up with ways to improve something with millions of dollars of R&D. S65s experience rod bearing wear on both street and track cars. See the used oil analysis image provided by a customer who is experiencing rod bearing failure under normal driving conditions! Even normal street engine use is leading to bearing failure at a much higher rate that expected."

**Vendor 2:**

"Rod bearings continue to be a sore subject among M3, M5, and M6 owners. The rod bearings in the S54 I6, S85 V10, and S65 V8 have been known to fail within 60,000 miles. There could be a number of reasons for premature failure with a lot of finger-pointing as to the real cause. Whatever the reason, rod bearings are wearing out sooner than expected and their replacement should be considered a required preventative maintenance item. . .

\*       \*       \*

\* BMW released an updated rod bearing around 2011 that uses different materials than the original design. The old rod bearings were constructed with several layers or metal, including copper and lead. If an engine oil

---

[24] See https://store.vacmotorsports.com/vac-performance-coated-rod-bearing-kit-bmw-s65-p3479.aspx; http://www.turnermotorsport.com/BMW-E90/c-392-rod-bearing-kits.aspx; http://www.bimmerworld.com/S65-Treated-Rod-Bearing-Upgrade-Kit_2.html; http://www.bimmerboost.com/content.php?3482-VAC-Motorsports-S65-Maintenence-Kit-(rod-bearings-rod-bolts-oil-pan-baffle); https://www.ecstuning.com/BMW-E92-M3-S65_4.0L/Engine/Mechanical/ES2981591/ (last visited Feb. 26, 2016).

analysis revealed high levels of these specific metals then it was a sure sign that the rod bearings were nearing replacement. However, the new BMW bearings do not use copper or lead so an oil analysis will not alert you to heavy bearing wear. The new bearings are also a harder material which prolonged the life of the bearing but increased the likelihood of crankshaft damage if a bearing failed. Even though the bearing theoretically lasts longer it's even more important to preventatively replace them before they damage the crankshaft."

**Vendor 3:**

"Our S65 Treated Rod Bearing Upgrade Kit is the ultimate solution for the E9X M3's high-revving S65 V8 engine. These high-tech, race bred engines have a rod bearing problem from the factory, much like its predecessor's S54 engine. We've seen multiple engines throw rods, and replacement after the fact will cost you over $15,000. . ."

**Vendor 4:**

"We all know the S65 has a rod bearing issue. Not all engines suffer from premature bearing wear/failure, but enough do. We have had quite a few S65s through our machine shop and some showed some serious wear. BMW has had rather embarrassing issues with rod bearings in the past so we wanted to get ahead of the curve and release the 3 proven products that will strengthen our favorite BMW engines. For those interested in the ultimate in oil management, our billet dry sump kit is for you!"

**Vendor 5:**

"The S65 engine has a known history of rod bearing failure, and if your engine is higher mileage, don't let this catastrophic failure happen to you. Replace your rod bearings and prevent a spun bearing which can trash your crankshaft."

**C.**   **Complaints Filed with NHTSA**

94.   Representative examples of complaints on the NHTSA website regarding the

Class Vehicles are included below (with emphasis supplied in capitalized bold, underlined

letters).[25]


Date Complaint Filed: 07/20/2013
Date of Incident: 06/23/2013
NHTSA ID Number: 10525919
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): WBSWD935X8P...(M3)
SUMMARY:
THE ENGINE IN MY BMW DIED AT 74,598 MILES, NO WARNING LIGHTS AND
NO WEIRD NOISES. IT DIED WHEN I WAS DRIVING THE SPEED LIMIT (65) ON
THE HIGHWAY DOING NOTHING OUT OF THE ORDINARY, WHEELS LOCKED
UP IN TRAFFIC SO I HAD TO PUSH IN CLUTCH. IT WAS A VERY LIFE
THREATENING SITUATION BECAUSE A BIG RIG ALMOST CRASHED INTO
MY CAR. I COASTED TO THE SIDE OF THE HIGHWAY TO CHECK IT OUT: THE
ENGINE WAS NOT OVERHEATING AND THERE WAS NO FLUIDS ON THE
GROUND. AS I TRIED STARTING THE CAR UP AGAIN I COULD HEAR THE
FUEL PUMP TURNING ON AND THE STARTER MOTOR CLICKING, BUT THE
ENGINE WOULDN'T TURN OVER. I GOT THE CAR TOWED TO THE
DEALERSHIP AND A FEW DAYS LATER IT WAS MADE KNOWN TO ME BY
THE DEALERSHIP THAT MY ENGINE WAS SEIZED AND THAT I WOULD
HAVE TO PAY $19,000 FOR A NEW ENGINE AND $6,000 FOR THE LABOR TO
INSTALL IT. I MADE THE DEALERSHIP AWARE THAT I KEPT UP WITH THE
MAINTENANCE, AND THAT NOTHING WAS INDICATING TO ME THAT MY
ENGINE WAS ABOUT TO FAIL. I INSTRUCTED THE DEALERSHIP TO
CONTACT BMW NORTH AMERICA (BMW HEADQUARTERS FOR NORTH
AMERICA) FOR A "GOOD WILL" REPLACEMENT, BUT MY REQUEST WAS
DENIED. **THIS PROBLEM IS DIRECTLY RELATED TO THE ROD BEARING**
**INSIDE THE ENGINE, WHICH GAVE OUT BECAUSE THERE IS NO**
**ADEQUATE LUBRICATION TO THEM, I HEARD OF THESE ROD**
**BEARINGS GIVING OUT ON THE S65 ENGINE ALL OVER WEB FORUMS,**
**MULTIPLE PEOPLE HAVE HAD THIS HAPPEN TO THEM**. DURING MY
WARRANTY PERIOD I DID LET THEM KNOW THAT MY CAR WOULD GO IN
LIMP MODE (LOW POWER MODE ON ENGINE, MAX SPEED ABOUT 40MPH)
AND I WAS HEARING TICKING NOISES (DEALERSHIP SAID THIS WAS
NORMAL) THAT WERE NOT PRESENT WHEN THE CAR WAS REALLY NEW
(THE FIRST 5000 MILES I PUT ON THE CAR). THE DEALERSHIP AND BMW

---

[25] The foregoing complaints are reproduced as they appear on the NHTSA website. Any
typographical errors are attributable to the original author of the NHTSA complaint.

NORTH AMERICA DON'T CARE ABOUT THESE PROBLEMS WHICH WERE
PRESENT DURING MY ENTIRE OWNERSHIP OF THE CAR (IN WARRANTY
PERIOD) AND THEY DENIED THE FREE REPLACEMENT BECAUSE MY CAR IS
NOW OUT OF WARRANTY. *TR

Date Complaint Filed: 04/26/2015
Date of Incident: 04/24/2015
NHTSA ID Number: 10712972
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): WBSWD93558P...
    SUMMARY:
    ENGINE BEGAN SUDDENLY MAKING A VERY LOUD KNOCKING SOUND
    WITHOUT ANY WARNING, AND I DROVE IT STRAIGHT TO SANDY SANSING
    BMW SERVICE CENTER, WHERE THEY STATED THAT **THE VEHICLE HAS
    SUFFERED A CATASTROPHIC CRANK BEARING FAILURE**. THE ENGINE
    HAS TO BE REPLACED NOW... CAR HAS BEEN METICULOUSLY MAINTAINED
    AND ALWAYS SERVICED AT BMW DEALERS SINCE IT WAS NEW... A CAR
    WITH 56K MILES ON IT SHOULD NOT HAVE SUCH AN EXTREME FAILURE IN
    THIS NATURE...

Date Complaint Filed: 06/25/2015
Date of Incident: 05/05/2015
NHTSA ID Number: 10730302
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): Not Available
    SUMMARY:
    TL* THE CONTACT OWNS A 2008 BMW M3. WHILE DRIVING AT 60 MPH, THE
    CONTACT HEARD A SUDDEN KNOCKING SOUND AND THE VEHICLE
    STALLED. THE VEHICLE RESTARTED, BUT THE NOISE RECURRED. THE
    VEHICLE WAS TOWED TO A DEALER WHERE **IT WAS DIAGNOSED WITH
    ROD BEARING FAILURE AND THE ENGINE NEEDED TO BE REPLACED**.
    THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED
    OF THE ISSUE. THE VIN AND FAILURE MILEAGE WERE UNAVAILABLE.

Date Complaint Filed: 08/20/2014
Date of Incident: 08/10/2014
NHTSA ID Number: 10626663
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): WBSDX9C57BE...
    SUMMARY:
    TICKING NOISE IN THE ENGINE GRADUALLY GOT LOUDER. OIL WARNING
    THAT IT WAS LOW ON OIL. ADDED OIL, STILL SAID IT WAS LOW, THEN
    SAID IT WAS TOO MUCH. THEN SAID IT WAS LOW (**PARTICLES FROM
    BEARINGS WERE CLOGGED IN OIL SENSOR GIVING FALSE READING**).
    FINALLY PARKED CAR WHEN NOISE WAS SO GREAT THAT I THOUGHT IT
    WAS GOING TO BLOW UP. **ROD BEARS DISINTEGRATED ON CYLINDERS 2
    AND 5. HAD TO REPLACE THE ENGINE**. *TR

95.    Upon information and belief, BMW regularly monitors these NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles. NHTSA complaints establish that BMW knew, or should have known, of the engine defect *at least* as early as July 20, 2013, a time when many Class Vehicles were within the warranty period.

**D.    BMW's Warranty-Related Practices**

96.    BMW issued a "New Vehicle Limited Warranty" to each owner or lessee of the Class Vehicles.

97.    Under the basic New Vehicle Limited Warranty, BMW agreed to repair defects reported within the earlier of 4 years or 50,000 miles. The New Vehicle Limited Warranty warrants against defects in materials or workmanship to the first retail purchaser and to each subsequent purchaser. Under the warranty, BMW states it "will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts."

98.    BMW instructs vehicle owners and lessees to bring their vehicles to a BMW dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to BMW dealerships with complaints related to the Rotating Assembly Defect.

99.    BMW has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's abuse and/or neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the rotating assembly is inherently defective and will inevitably fail.

100.    In addition, upon information and belief, BMW has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a BMW dealership (an illegal

requirement[26]), before determining whether to make the necessary repairs under warranty. BMW, however, knows that the defect in the Class Vehicles' engines manifest despite owners and lessees following BMW's recommended oil change schedule. In many instances, even if consumers produce vehicle maintenance history, BMW blames the known Rotating Assembly Defect and resulting engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges in excess of $20,000 to repair/replace the engine.

101.    In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Rotating Assembly Defect, despite such defect having been contained in the Class Vehicles when manufactured by Defendants, repair and replacement of the S65 Engine, and the unnecessary and premature replacement of the Bearings, crank shaft, oil pumps, and other damaged engine components.

## CLASS ALLEGATIONS

102.    Plaintiffs bring this action on their own behalf, and on behalf of a California class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

> All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

103.    Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition based on discovery and further investigation.

104.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of

---

[26] http://www.consumer.ftc.gov/articles/0138-auto-warranties-routine-maintenance

the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that tens of thousands of Class Vehicles have been sold and leased in California alone.

105.    <u>Existence and Predominance of Common Questions of Fact and Law:</u> Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

    a.   The Class Vehicles were sold with the Rotating Assembly Defect;

    b.   BMW knew of the Rotating Assembly Defect but failed to disclose the problem and its consequences to its customers;

    c.   A reasonable consumer would consider the Rotating Assembly Defect or its consequences to be material;

    d.   BMW has failed to provide free repairs as required by its New Vehicle Limited Warranty;

    e.   BMW should be required to disclose the existence of the Rotating Assembly Defect; and

    f.   Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes and common law as asserted herein.

106.    <u>Typicality:</u> All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs purchased a Class Vehicle with the Rotating Assembly Defect, as did each member of the Class. Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

107.    <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

108.    <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

109.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**("CLRA") (Cal. Civ. Code § 1750, *et seq.*)**

110.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

111.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Members of the Class against all Defendants.

112.    Defendants are "persons" as that term is defined in California Civil Code § 1761(c).

113.    Plaintiffs and the Class are "consumers" as that term is defined in California Civil Code §1761(d).

114.    Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
>
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
>
> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
>
> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

115.     Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

116.     Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

117.     Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles and the Rotating Assembly Defect because:

a.    Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b.    Defendants made some representations to the Class Members regarding the durability and fitness of Class Vehicles which were misleading in the absence of disclosures regarding the inherently defective nature of the rotating assembly;

c.    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

d.    Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

e.    Defendants actively concealed the safety defect and the associated repair costs by asserting to Plaintiffs and Class Members that the cause of their engine problems was due to Plaintiffs and the Class Members' inability to maintain the proper vehicle maintenance despite knowing the repairs needed to correct the defect.

118.     In failing to disclose the Rotating Assembly Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

119.     The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiffs

and the Class known about the defective nature of the Class Vehicles and their engines, they

would not have purchased the Class Vehicles or would have paid substantially less for them.

120.    Plaintiffs have provided Defendants with notice of its violations of the CLRA

pursuant to California Civil Code § 1782(a).

121.    Plaintiffs and the other Class Members' injuries were proximately caused by

Defendants' fraudulent and deceptive business practices.

122.    Therefore, Plaintiffs and the other Class Members are entitled to equitable and

monetary relief under the CLRA.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")— "FRAUDULENT" BUSINESS PRACTICE
### (CAL. BUS. & PROF. CODE § 17200)

123.    Plaintiffs and the Class incorporate by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

124.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members

of the Class against all Defendants.

125.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair

competition," including any "fraudulent business act or practice" consisting of "deceptive, untrue

or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

126.    Defendants have engaged in fraudulent business practices by the conduct,

statements, and omissions described above and in the paragraphs that follow.

127.    Defendants have engaged in "fraudulent" business practices by knowingly and

intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles the

material fact that the vehicles suffer from a defect in the rotating assembly of the engine, the

manifestation of which will, at a minimum, result in increased costs of maintenance and

diminished value of the vehicle, and which may result in engine failure rendering the vehicle inoperable and may also pose a safety risk.

128.    Defendants should have disclosed this information because it is material information that would affect the average consumer's willingness to buy the Class Vehicles in the first place, or at a minimum, would have affected the price they would have been willing to pay for the vehicles. Moreover, the fact that the Rotating Assembly Defect is a safety issue triggered a duty on Defendants' part to affirmatively disclose the issue to consumers.

129.    The information was exclusively known to Defendants on account of Defendant's exclusive knowledge and insight into the design and manufacture of the engines in the Class Vehicles and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

130.    These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

131.    Plaintiffs seek to enjoin further fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

### THIRD CAUSE OF ACTION
### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")—
### "UNLAWFUL" BUSINESS PRACTICE
### (CAL. BUS. & PROF. CODE § 17200)

132.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

133.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Class against all Defendants.

134.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful business act or practice." CAL. BUS. & PROF. CODE § 17200. A practice is "unlawful" if it violates *either* express statutory enactments or the common law of the State of California.

135.    The distribution and sale of defective products, including defective automobiles, is a violation of the civil law in the State of California, as reflected in numerous published California appellate decisions. Defendants have thus engaged in "unlawful" business practices consisting of the sale and distribution of defective vehicles within the State of California. This is particularly true in light of the fact that Defendants distributed and sold these vehicles to unsuspecting consumers so even though Defendants knew or should have known about Rotating Assembly Defect and in light of the fact that Rotating Assembly Defect constitutes a safety issue.

136.    Defendants' acts and practices are unlawful because they constitute the sale and/or distribution of a defective vehicle in violation of California common law and/or violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

137.    Defendants' unlawful acts and practices caused economic harm to Plaintiffs and the Class Members by causing them to incur expenses they would not have otherwise occurred

46

but for the Rotating Assembly Defect in the Class Vehicles, but depriving them of the loss of use

their vehicles, by rendering the vehicles worth less than they would have otherwise been but for

the Rotating Assembly Defect, and/or by causing Plaintiffs and the Class Members to pay more

for Class Vehicles than they would have otherwise paid if they would have bought them at all.

### FOURTH CAUSE OF ACTION
#### CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")—
#### "UNFAIR" BUSINESS PRACTICE
#### (CAL. BUS. & PROF. CODE § 17200)

138.    Plaintiffs and the Class incorporate by reference each preceding and succeeding

paragraph as though fully set forth at length herein.

139.    Plaintiffs brings this claim on behalf of themselves and on behalf of the members

of the Class against all Defendants.

140.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair

competition," including any "unfair" business act or practice. CAL. BUS. & PROF. CODE § 17200.

A practice is "unfair" if it violates *either* express statutory enactments or the common law of the

State of California.

141.    Under California law, "an 'unfair' business practice occurs when it offends an

established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers" and which cannot be justified by any legitimate

countervailing interests.

142.    As alleged herein, Defendants knowingly sold and distributed thousands of

vehicles to unsuspecting consumers with inherent defects in their engines, defects that will cost

each consumer thousands—if not *tens* of thousands—of dollars to repair. Making matters worse,

because the engine defect can result in sudden, catastrophic engine failure that results in a loss of

power steering, the defect poses a safety threat to not only the owner/operator of the Class

Vehicles but any other motorists or pedestrians who happen to be in the vicinity of a Class
Vehicle when its engine fails.

143.     Defendants knowingly obscured and concealed the defect from customers by, for
example, attributing any symptoms of excessive rod-bearing wear to "normal exhaust expansion
noises." Similarly, when engines in Class Vehicles *do* fail under warranty, Defendants BMW NA
shirk their warranty obligations, often by falsely accusing the owner of "over-revving" the
engine.

144.     By deceiving customers regarding a significant defect in the engines of the Class
Vehicles the failure of which renders the Class Vehicles functionally useless and presents a
safety hazard, and then compounding that deception by evading their obligations to repair or cure
Class Vehicles that present with the defect, Defendants' conduct is immoral, unethical,
oppressive, unscrupulous, and substantially injurious to consumers.

145.     The injuries suffered by Plaintiffs and the Class Members are greatly outweighed
by any potential countervailing benefit to consumers or to competition, nor are they injuries that
Plaintiffs and the Class Members should have reasonably avoided. Put simply, Defendants have
no legitimate purpose behind knowingly selling vehicles with defective engines to unsuspecting
consumers and then obscuring the fact that a defect exists when a customer presents with
undeniable signs of excessively, accelerated rod-bearing wear.

## FIFTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
### (CAL. BUS. & PROF. CODE §§ 17500, *et seq.*)

146.     Plaintiffs and the Class incorporate by reference each preceding and succeeding
paragraph as though fully set forth at length herein.

147.     Plaintiffs brings this claim on behalf of themselves and on behalf of the Members
of the Class against all Defendants.

148.     California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

149.     BMW caused to be made or disseminated throughout California and the United States, through advertising, marketing and other publications, statements that were misleading by their omission of material facts, and which were known, or which by the exercise of reasonable care should have been known to BMW, to be misleading to consumers, including Plaintiffs and the other Class Members. In particular, Defendants omitted material facts regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint which only Defendants knew and which were material to a reasonable consumer insofar as disclosure of the omitted information would have destroyed Class Members' willingness to purchase the Class Vehicles in the first place or, at a minimum, would have caused them to pay less for them.

150.     Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of BMW's unfair, unlawful, and/or deceptive practices. Plaintiffs' reliance is presumed because the statements at issue with respect to the safety and reliability of the Class Vehicles were rendered misleading by omissions of material fact. BMW's representations were misleading because the Class Vehicles were distributed with the undisclosed Rotating Assembly Defect. Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

49

Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

151.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of BMW's business. BMW's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

152.    Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin BMW from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money BMW acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

153.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.    Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Defendants' warranties are express warranties under state law.

155.    The parts affected by the defect, including the rotating assembly and engine block, were manufactured and distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

156.    Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing

to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

157.    Plaintiffs notified Defendants of the breach within a reasonable time, and/or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also know of the defect and yet have chosen to conceal it and to not comply with their warranty obligations.

158.    As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the Rotating Assembly Defect.

159.    Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.[27]

160.    The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time

---

[27] *See Henderson v. Volvo Cars of N. Am., LLC*, No. CIV. 09-4146 (DMC), 2010 WL 2925913, at *9 (D.N.J. July 21, 2010) (declining to dismiss express warranty claims because plaintiffs alleged the warranty was unconscionable due to allegations that "members of the Class had no meaningful choice in determining those time limitations" and "a gross disparity in bargaining power existed" between defendant and class members); *Skeen v. BMW of N. Am., LLC*, No. 2:13-CV-1531-WHW-CLW, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014) ("Plaintiffs have adequately alleged substantive unconscionability by claiming that Defendants knew the timing chain tensioners would fail and manipulated the warranty terms to avoid paying for it.").

limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between BMW and the Class Members, and BMW knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

161.    Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(by Plaintiff Andy Dechartivong)**

162.    Plaintiff Dechartivong and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

163.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

164.    Defendants provided Plaintiff Dechartivong and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their engines suffered from the Rotating Assembly Defect at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

165.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty

that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

166.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Dechartivong and the other Class Members with reliable, durable, and safe transportation.

167.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**EIGHTH CAUSE OF ACTION**
**BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON–MOSS**
**WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)**

168.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

169.    Plaintiffs bring this action on behalf of themselves and on behalf of the Class against Defendant BMW-NA, only.

170.    Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

171.    Defendant BMW-NA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

172.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

173.    Defendant BMW-NA's New Vehicle Limited 4 years/50,000 miles warranty is "written warranties" within the meaning of 15 U.S.C. § 2301(6).

174.    Defendant BMW-NA breached the express warranties by:

     i.    Providing a 4 year/50,000 miles New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    ii.    Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

   iii.    Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective rotating assembly.

175.    Plaintiffs and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

176.    Defendant BMW-NA's breach of the express warranties has deprived the Plaintiffs and the other Class Members of the benefit of their bargain.

177.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

178.    Defendant BMW-NA has been afforded a reasonable opportunity to cure its breach of the written warranties and/or Plaintiffs and the other Class Members were not required to do so because affording Defendant BMW-NA a reasonable opportunity to cure its breach of written warranties would have been futile. Defendant BMW-NA was also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

179.    As a direct and proximate cause of Defendant BMW-NA's breach of the written warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendant BMW-NA's conduct damaged Plaintiffs and the

other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## NINTH CAUSE OF ACTION
### VIOLATION OF THE SONG-BEVERLY ACT—BREACH OF IMPLIED WARRANTY
### (Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)
### (by Plaintiff Andy Dechartivong)

180.     Plaintiff Andy Dechartivong and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

181.     At all relevant times hereto, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

182.     Defendants provided Plaintiff Andy Dechartivong and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

183.     The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

184.     Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by BMW were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their

engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

185.     Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Rotating Assembly Defect and/or manufacture of the S65 Engines.

186.     Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

<u>TENTH CAUSE OF ACTION</u>
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

187.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

188.     Every contract in California contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

189.     Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class Members of the Rotating Assembly Defect in the Class Vehicles, and failing to fully and properly repair this defect.

190.     Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### COMMON-LAW FRAUD

191.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

192.     Defendants intentionally or negligently failed to disclose material, important facts to Plaintiffs and the Class. In particular, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect with the S65 Engine as described herein.

193.     The existence of defect was known only Defendants on account of their exclusive and superior knowledge regarding the design and manufacture of the S65 Engine. As such, Plaintiffs and the Class did not and could not have discovered the existence of the defect at the time they purchased or leased their vehicles, a defect which was not readily discoverable until it manifested after purchase or lease, often after the New Vehicle Limited Warranty has expired. Thus Defendants either knew or should have known that their representations to the Class regarding the Class Vehicles were deceptively incomplete by omitting any reference to the Rotating Assembly Defect.

194.     Defendants intended for Plaintiffs and the Class Members to rely on the absence of this material information in choosing to purchase or lease a Class Vehicles at the price they were offered for sale or lease. Plaintiffs and the other Class Members did, in fact, reasonably rely on the omission of this material information in choosing to purchase or lease a Class Vehicles at the price they were offered for sale or lease. Had Plaintiffs and the Class Members known about the Rotating Assembly Defect, they would not have purchased or leased the Class Vehicles, or would have done so at a lower price.

195.     As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all of the resultant problems and have suffered damages as a result.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. appoint Plaintiffs as the representative of the Class and his counsel as Class counsel;

C. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class Members are entitled (except such damages are not currently sought by Plaintiff Andy Dechartivong under the CLRA);

D. award pre-judgment and post-judgment interest on such monetary relief;

E. grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Rotating Assembly Defect;

F.   award reasonable attorneys' fees and costs; and

G.   grant such further relief that this Court deems appropriate.


Dated: November 16, 2016

Respectfully submitted,

By:     *//s// Matthew D. Schelkopf*
        Matthew D. Schelkopf
        McCuneWright LLP
        555 Lancaster Avenue
        Berwyn, Pennsylvania 19312
        Telephone: (610) 200-0581
        E-mail: mds@mccunewright.com


        Paul J. Scarlato
        GOLDMAN SCARLATO & PENNY, P.C
        Eight Tower Bridge, Suite 1025
        161 Washington Street
        Conshohocken, PA 19428
        Telephone: (484) 342-0700
        Facsimile: (484) 580-8729
        E-mail: scarlato@lawgsp.com


        Benjamin I. Siminou (admitted *pro hac vice*)
        THORSNES BARTOLOTTA McGUIRE LLP
        2550 Fifth Avenue, Eleventh Floor
        San Diego, California 92103
        Telephone: 619-236-9363
        Facsimile: 619-236-9653
        E-mail: siminou@tbmlawyers.com